ACCEPTED
15-25-00140-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
9/19/2025 5:52 PM
CHRISTOPHER A. PRINE
CLERK

**No. 15-25-00140-CV**

**IN THE FIFTEENTH COURT OF APPEALS, AUSTIN, TEXAS**

RECEIVED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
9/19/2025 5:52:15 PM
CHRISTOPHER A. PRINE
Clerk

**IN RE POWERED BY PEOPLE AND ROBERT FRANCIS O'ROURKE,**

***Relators.***

Original Proceeding from the
348th Judicial District Court of Tarrant County, Texas
Hon. Megan Fahey, Presiding Judge
Cause No. 348-367652-25

**Brief for *Amici Curiae* Faith Commons, Fellowship Southwest, and Texas Freedom Network in Support of Relators**

Peter Steffensen
State Bar No. 24106464
Molly Ryan*
State Bar No. 24148032
Amanda Sparks*
State Bar No. 24148033
SMU DEDMAN SCHOOL OF LAW
FIRST AMENDMENT CLINIC
P.O. Box 750116
Dallas, TX 75275-0116
Telephone: (214) 768-4077
psteffensen@smu.edu


Counsel for *Amici Curiae*

Kathryn "Kassi" Yukevich
State Bar No. 24133390
TILLOTSON JOHNSON & PATTON
1201 Main St., Suite 1300
Dallas, Texas 75202
Telephone:  (214) 382-3046
Facsimile:    (214) 501-0731
kyukevich@tillotsonlaw.com

Thomas S. Leatherbury
State Bar No. 12095275
THOMAS S. LEATHERBURY LAW, PLLC
Cumberland Hill School Building
1901 North Akard Street
Dallas, TX 75201-2305
(214) 213-5004
tom@tsleatherburylaw.com

* Associate Member of the State Bar, authorized under Rule VI.A(4) of the Rules Governing the Supervised Practice of Law by Qualified Law Students.

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................ ii

TABLE OF AUTHORITIES ................................................................................... iii

INTEREST OF AMICI CURIAE ............................................................................ 1

SUMMARY OF ARGUMENT .............................................................................. 3

ARGUMENT ......................................................................................................... 6

    I.      The DTPA Protects Consumers from Fraud in the Purchase of Goods or Services and Does Not Regulate Donations or Gifts. ........................ 6

    II.    Real Party's Claim Impermissibly Expands the Ability of Both the Attorney General and Consumers to Bring Suit Against *Amici*. .......... 8

    III.   The First Amendment and the Texas Constitution Protect Freedom of Speech and Prohibit Retaliation for Disfavored Speech. ..................... 13

    IV.   Real Party's Continued Pursuit of Retaliatory DTPA Claims Against Relators Will Chill Protected Speech and Charitable Activities of *Amici*. ................................................................................................... 15

    V.    Direct Harm Will Befall *Amici* and the Communities They Serve If Mandamus Is Not Granted. .................................................................. 17

CONCLUSION AND PRAYER ........................................................................... 19

CERTIFICATE OF SERVICE ............................................................................. 20

CERTIFICATE OF COMPLIANCE .................................................................... 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bantam Books, Inc. v. Sullivan*,
372 U.S. 58 (1963) ............................................................................... 13

*Bryan v. City of Madison, Miss.*,
213 F.3d 267 (5th Cir. 2000) ................................................................ 9

*Davenport v. Garcia*,
834 S.W.2d 4 (Tex. 1992)..................................................................... 14

*Flenniken v. Longview Bank and Tr. Co.*,
661 S.W.2d 705, 707 (Tex. 1983) ........................................................ 6

*Hartman v. Moore*,
547 U.S. 250 (2006) .............................................................................. 13

*In re Office of Attorney Gen.*,
No. 15-24-00091-CV, 2025 WL 2204075 (Tex. App. [15th Dist.] Aug.
4, 2025).................................................................................................. 16

*In re M.N.*,
262 S.W.3d 799 (Tex. 2008) ................................................................. 7

*Media Matters for Am. v. Paxton*,
138 F.4th 563 (D.C. Cir. 2025)............................................................. 14

*Nat'l. Religious Broadcasters et al. v. Long*,
Case No. 6:24-cv-00311 (E.D. Tex.), ECF No. 35 (July 7, 2025) ............ 12

*Nat'l Rifle Ass'n v. Vullo*,
602 U.S. 175 (2024) .............................................................................. 13

*Paxton v. Annunciation House, Inc.*,
No. 24-0573, 2025 WL 1536224 (Tex. May 30, 2025)............................ 16

*PPG Indus., Inc. v. JMB/Hous. Ctrs. Partners Ltd. P'ship*,
146 S.W.3d 79, 84 (Tex. 2004) ............................................................ 6

*Riverside Nat'l Bank v. Lewis*,
603 S.W.2d 169, 173 (Tex. 1980) ................................................................. 6

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
515 U.S. 819 (1995) ..................................................................................... 13

*Smith v. California*,
361 U.S. 147 (1959) ..................................................................................... 13

*United States v. Menendez*,
291 F. Supp. 3d 606 (D.N.J. 2018) ............................................................. 10

*Vill. of Schaumburg v. Citizens for a Better Env't*,
444 U.S. 620 (1980) ..................................................................................... 13

*Virginia v. Am. Booksellers Ass'n*,
484 U.S. 383 (1988) ..................................................................................... 13

**Statutes**

TEX. BUS. & COM. CODE § 17.45 .................................................................... 7

TEX. BUS. & COM. CODE § 17.47 .................................................................... 6

**Other Authorities**

*Commerce*, Black's Law Dictionary (12th ed. 2024) ...................................... 10

*Consumer*, Black's Law Dictionary (12th ed. 2024) ........................................ 8

*Trade*, Black's Law Dictionary (12th ed. 2024) .............................................. 9

## INTEREST OF AMICI CURIAE

*Amici Curiae* are religious and religiously affiliated organizations that work to provide charitable services and resources to underserved communities. These charitable services are funded in large part through individual donations that *Amici* aggregate and direct towards the services and communities where they see the most need. Much of *Amici's* charitable work is threatened by the Attorney General's overreading of the Texas Deceptive Trade Practices Act ("DTPA"). The Attorney General's misapplication of the DTPA leaves *Amici* vulnerable to the same prosecutorial overreach experienced by Relators in this matter and threatens to harm not just *Amici*, but the religious communities they work for and alongside each day in service of their faith.

*Amici's* interest in this matter derives from, among other sources, the Hebrew and Christian Bibles and the Quran. The practice of charity and almsgiving is a core tenet of the Jewish and Christian faiths:

> "If your brother becomes impoverished and his means falter in your proximity, you shall strengthen him." *Leviticus* 25:35.

> "One person gives freely, yet gains even more; another withholds unduly, but comes to poverty. A generous person will prosper; whoever refreshes others will be refreshed." *Proverbs* 11:24-25.

Charitable giving, or Zakât is also a pillar of Islam:

> "[G]ive the Zakât-Charity, and therewith lend God a most goodly loan. For whatever good you advance for your souls, you shall find its reward with God in the Hereafter; yet it

1

shall be far better and much greater in reward." *Sûrat Al-Muzzammil* 73:20.

These same faiths teach their followers to speak for those who cannot speak for themselves:

> "Open your mouth for the mute, for the rights of all who are destitute. Open your mouth, judge righteously, defend the rights of the poor and needy." *Proverbs* 31:8-9.

In short, while *Amici* may disagree on many things, they are united in their belief that religious speech must be protected, especially in the context of an organization's ability to raise funds for charitable pursuits and care for the most disadvantaged among us.

*Amici*[1] are:

Faith Commons: Faith Commons is an interfaith organization that works to bring together followers of all religions to further their common values of faith, justice, and dignity for all people. Faith Commons works directly with underserved communities—including immigrant communities—to provide basic necessities, like food and shelter.

Fellowship Southwest: Fellowship Southwest is a faith-based organization that catalyzes and amplifies the work of Christians as they practice compassion and pursue

---

[1] No party's counsel authored this brief in whole or in part. No party or party's counsel contributed money that was intended to fund preparation or submission of this brief, and no person other than the amici curiae or their counsel contributed money that was intended to fund preparation or submission of this brief.

justice. Fellowship Southwest and its supporting churches work directly to provide aid and support to immigrant and refugee communities and to end hunger across Texas.

Texas Freedom Network: Texas Freedom Network ("TFN") fights for the preservation of true religious freedom and the separation of church and state. TFN believes that the separation of church and state protects the rights of all Texans to freely practice the faith of their choice, the way they choose to practice it, free of government interference.

This diverse coalition of *Amici* are compelled by their faith to speak regarding the chilling effect that the Attorney General's claims will have on religious and religiously affiliated organizations, particularly those whose charitable giving centers on groups disfavored by whatever government is in power.

## SUMMARY OF ARGUMENT

*Amici* are diverse groups from diverse backgrounds who do not agree on everything. That makes it all the more telling that they share a singular perspective on the public interest at stake in this case. *Amici* have an interest in and derive spiritual benefits from helping those less fortunate within our society. Through their faith-based work, *Amici* have a unique perspective and firsthand knowledge of the chilling effect that the expansion of the Attorney General's DTPA enforcement power will have on religious organizations and the communities that they serve. Religious groups across the State of Texas, including *Amici*, regularly make general appeals soliciting contributions for charitable outreach. Those same religious groups then make decisions

about how to allocate charitable assistance to people and groups from all walks of life, including refugee and immigrant communities, incarcerated individuals, and others that some might see as undesirable or undeserving. *Amici* also work to advance their shared values of freedom, justice, faith, and community through interfaith programs, and frequently fundraise to support those programs.[2] The Attorney General's expansion of DTPA enforcement will undoubtedly chill those activities.

*Amici* are united in their belief that helping the underprivileged is of paramount importance for their faith. For decades, jurisprudence around the DTPA has been clear: the DTPA is intended to protect consumers from deceptive or fraudulent activity in the purchase or sale of goods and services. The Attorney General's theory of DTPA liability here, if successful, could easily be expanded to place religious organizations like *Amici* squarely within the Office of the Attorney General's enforcement powers. Such a vast, textually unsupported transformation of the statute could give whomever occupies the office *carte blanche* to embroil faith organizations across Texas in costly litigation over whether their representations regarding funds were honest or—more dangerously—comport with any one person's subjective determination of what constitutes an appropriate use of funds to promote the tenets of Judaism, Christianity,

---

[2] *See, e.g.,* Faith Commons, North Texas Giving Day Fundraising Page, https://www.northtexasgivingday.org/organization/faithcommons (last accessed Sept. 17, 2025).

Islam, or any other faith. That is tantamount to the State or the Attorney General deciding what those religions should believe and value.

Refusing to issue a mandamus directing dismissal of the DTPA claims in this matter would signal to *Amici* and other faith organizations that they are vulnerable to prosecution if they engage in charitable giving that either the Office of the Attorney General or a one-time donor disagrees with. Endorsing the Office of the Attorney General's overbroad interpretation of the DTPA will result in a substantial chilling effect across the faith community in Texas, robbing *Amici* of the opportunity to live out their faith in meaningful ways without fear of retaliation and potentially depriving already vulnerable communities of critical charitable assistance. The failure to grant the mandamus relief requested by Relators will undermine the spiritual and social fabric that has grown from the charitable work and community building that *Amici* engage in. *Amici* urge the Court to reject the Attorney General's atextual reading of the DTPA and safeguard the rights to free speech and religious liberty of all involved.

*Amici* join Relators in asking that a mandamus issue to order the dismissal of the Attorney General's DTPA claims for lack of subject matter jurisdiction.

**ARGUMENT**

**I.      The DTPA Protects Consumers from Fraud in the Purchase of Goods or Services and Does Not Regulate Donations or Gifts.**

The DTPA was designed to protect consumers from false or misleading practices in the purchase and sale of goods or services by empowering consumers to bring their own complaints. *Riverside Nat'l Bank v. Lewis*, 603 S.W.2d 169, 173 (Tex. 1980). Indeed, the Texas Supreme Court has recognized that "the DTPA's primary goal [is] to protect consumers by encouraging them to bring consumer complaints. . . ." *PPG Indus., Inc. v. JMB/Hous. Ctrs. Partners Ltd. P'ship*, 146 S.W.3d 79, 84 (Tex. 2004). "While the DTPA allows the attorney general to bring consumer protection actions, one of the statute's primary purposes is to encourage consumers themselves to file their own complaints . . . ." *id.*, with the Attorney General empowered only to bring such suits on behalf of the "consumers" the DTPA is designed to protect. TEX. BUS. & COM. CODE § 17.47 ("Whenever the consumer protection division has reason to believe that any person is engaging in, has engaged in, or is about to engage in any act or practice declared to be unlawful by this subchapter…the division may bring an action");[3] *Flenniken v. Longview Bank and Tr. Co.*, 661 S.W.2d 705, 707 (Tex. 1983). Without that limitation on the Attorney General's enforcement power, the DTPA would provide blanket authority for

---

[3] Here again the DTPA articulates an important limitation: the Attorney General's enforcement power under the DTPA is entirely within the Consumer Protection Division, which is charged with protecting consumers, as opposed to the General Litigation Division or the Office of Special Litigation.

6

the Office of the Attorney General to prosecute almost any conduct that it deems "deceptive" or "fraudulent".

Importantly, the DTPA defines a "consumer" as "an individual … who seeks or acquires *by purchase or lease*, any *goods or services*." TEX. BUS. & COM. CODE § 17.45(4) (emphasis added). As Relators have pointed out, the DTPA's definition of consumer does not include a "donor or voter," nor does any reasonable reading of the statute support such a strained interpretation. As the Texas Supreme Court has repeatedly made clear, courts must "presume that the Legislature chooses a statute's language with care, including each word chosen for a purpose, while purposefully omitting words not chosen." *In re M.N.*, 262 S.W.3d 799, 802 (Tex. 2008).

Meanwhile, "goods" means only "tangible chattels or real property," and "services" means only "work, labor, or service *purchased or leased for use*, including services furnished in connection with the sale or repair of goods." TEX. BUS. & COM. CODE § 17.45(2)-(3) (emphasis added). Soliciting political donations does not fit within either of those definitions. And each of the provisions of the DTPA that the Attorney General relies on expressly cabins the DTPA to conduct that involves the purchase or lease of "goods" or "services." *See* TEX. BUS. & COM. CODE § 17.45(6) (using the definition of "goods and services" in the DTPA to define "trade" and "commerce"); 17.46(b)(2) (incorporating the definitions of "goods" and "services" to limit deceptive conduct), (b)(5) (same), (b)(7) (same), (b)(24) (same).

7

For these reasons, the DTPA does not apply to Relators' solicitation and use of political donations.

## II. Real Party's Claim Impermissibly Expands the Ability of Both the Attorney General and Consumers to Bring Suit Against *Amici*.

The gravamen of the Attorney General's allegations in the underlying complaint are as follows: (1) Relators solicited political donations using broad political appeals, (2) those broad appeals were—in some yet undefined way—confusing, misleading, or deceptive, and (3) that solicitation of political donations provided the "service of crowdsourcing political donations for legal political purposes." *See* M.R.0004-10; Real Party's Br. at 23. It is easy to see how this same DTPA framework could be improperly used against *Amici* and others like them.

***First***, the DTPA excludes charitable donors to religious organizations and individuals participating in almsgiving from the definition of "consumer," in the same way it excludes political donors and voters. This exclusion is consistent with the common understanding of the term "consumer." Black's Law Dictionary defines a consumer as someone who "buys goods or services for personal, family, or household use, with no intention of resale; a natural person who uses products for personal rather than business purposes." *See Consumer*, Black's Law Dictionary (12th ed. 2024). Similarly, Merriam-Webster defines "consumer" as a "one that utilizes economic goods." Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/consumer (last visited Sept. 17, 2025).

8

*Amici* are gravely concerned that interpreting the definition of "consumer" to include donors would expand the statute's reach far beyond what the legislature intended, rendering it overbroad and capable of selective misuse. *See Bryan v. City of Madison, Miss.*, 213 F.3d 267, 277 (5th Cir. 2000) (recognizing a selective enforcement claim where a "government official's acts were motivated by improper considerations, such as race, religion, or the desire to prevent the exercise of a constitutional right.").[4] The broad definition of "consumer" advanced by the Attorney General would render the clear textual limitations in the DTPA meaningless and its adoption would render any of *Amici's* donors or potential donors "consumers" under the DTPA.

In short, if the DTPA can be read to encompass political donors, it will necessarily encompass religious donors and charitable donors as well.

**Second**, the DTPA excludes almsgiving and the solicitation of charitable donations from its definition of "trade" and "commerce" in the same way it excludes the solicitation of political contributions. This too is consistent with the common understanding of the words "trade" and "commerce." Black's Law Dictionary defines trade as "the business of buying and selling or bartering goods or services," *Trade*, Black's Law Dictionary (12th ed. 2024), and commerce as the "exchange of goods and services, esp[ecially] on a large scale involving transportation between cities, states, and

---

[4] "[R]etaliation for an attempt to exercise one's religion or free speech would be expected to qualify" as an actionable form of selective enforcement. *Id.* at 277 n.18.

countries." *Commerce*, Black's Law Dictionary (12th ed. 2024). Here again, an adoption of the Attorney General's proposed expansion of the DTPA's definitions of "trade" and "commerce" in the political context would inescapably sweep in all fundraising appeals, including appeals by religious organizations.

**Third,** political donations generally involve an individual donating money to further the goals of a particular political candidate, political party, or issue-based organization. These donations are made without an expectation of commercial benefit.[5] The majority of political donations are small-dollar donations: $5, $10, or $20 is often all a donor can afford to give. As a result, political organizations must aggregate the donations they receive and, depending on the amount received, make a strategic choice about how to deploy those funds to reach a larger goal or advance a particular cause.

Similarly, religiously motivated donations possess many of the same hallmarks as political donations. Faith-based donations and religious almsgiving typically involve an individual donating money to a religious organization to further the values of a particular faith or religious denomination. *Amici* are actively involved in soliciting donations from members to, among other things, live in accordance with the charitable tenets of their faith and spread their shared values of freedom, justice, faith, and

---

[5] Indeed, making a campaign contribution for the specific purpose of receiving direct monetary or commercial benefit that rises to the level of a *quid pro quo* could—in many cases—be a criminal offense for one or both parties involved. *See, e.g.*, *United States v. Menendez*, 291 F. Supp. 3d 606, 624 (D.N.J. 2018).

10

community throughout Texas. These donations are made without an expectation of commercial benefit. And, like all organizations that fundraise or collect donations, religious organizations like *Amici* must aggregate the donations they receive and, depending on the amount received, make a strategic choice about how to deploy those funds to reach a larger goal in accordance with their faith, mission, and values.

The aggregation of donations is a necessary element of all fundraising, no matter the cause or goal. If the definition of "services" is expanded to include the aggregation of political donations—a byproduct of charitable giving in every context—it necessarily follows that the aggregation of religiously-motivated donations or other charitable donations would also be a service under the DTPA. This broad expansion leaves *Amici* and others like them subject to the threat of a DTPA action by anyone who disagreed with a particular expenditure of funds.

**Fourth**, political fundraising involves motivational and aspirational language. Indeed, the Attorney General cites to fundraising pleas like "pitch in now to support Texas Democrats as they fight Trump's plot to steal five congressional seats" and "Texas Democrats are fighting back. Help support their efforts to stop Trump's redistricting[,]" as examples of misleading or deceptive conduct.

Religious organizations like *Amici* also routinely use aspirational, faith-based language in fundraising: "Help us serve the poor." "Support our community outreach." "Join us in prayer and action." And religious texts and sermons are—as the coalition of *Amici* can attest—inherently personal and subjective. Soliciting donations in general

11

terms to, for example, "advance the goals of justice," "spread the teachings of Jesus Christ," or "live in accordance with Proverbs 11:24-25," are all subject to individual interpretation.

Subjecting aspirational fundraising appeals to DTPA review would chill religious expression and burden the free exercise of religion. Religious organizations would have to self-censor or avoid making broad, inspirational appeals altogether for fear that a disgruntled donor or the Attorney General could allege "deception" or "misrepresentation," even if the language is typical of religious fundraising.[6]

This enforcement framework would run counter to decades of First Amendment precedent that affords special protections to political, religious, and charitable solicitation. As the U.S. Supreme Court has made clear:

> [C]haritable appeals for funds, on the street or door to door, involve a variety of speech interests—communication of information, the dissemination and propagation of views and ideas, and the advocacy of causes—that are within the protection of the First Amendment. Soliciting financial support is undoubtedly subject to reasonable regulation but the latter must be undertaken with due regard for the reality that solicitation is characteristically intertwined with informative and perhaps persuasive speech seeking support for particular causes or for particular views on economic, political, or social issues, and for the reality that without solicitation the flow of such information and advocacy would likely cease.

---

[6] This risk is all the more acute considering the fact that the IRS recently agreed, in a Joint Motion for Consent Judgment, to allow religious leaders to endorse candidates from the pulpit to their congregations under certain circumstances without risking the church's tax-exempt status. *See Nat'l. Religious Broadcasters et al. v. Long*, Case No. 6:24-cv-00311 (E.D. Tex.), ECF No. 35 (July 7, 2025).

*Vill. of Schaumburg v. Citizens for a Better Env't,* 444 U.S. 620, 632 (1980). The Attorney General is supplanting the clear First Amendment protections afforded to fundraising appeals engaged in by both Relators and *Amici* in favor of selective DTPA enforcement actions.

**III.    The First Amendment and the Texas Constitution Protect Freedom of Speech and Prohibit Retaliation for Disfavored Speech.**

The First Amendment prohibits government retaliation on the basis of protected speech. *See, e.g.*, *Hartman v. Moore*, 547 U.S. 250, 256 (2006). This is true even when the retaliatory action is otherwise legal. Government officials—like the Attorney General—"cannot do indirectly what [they are] barred from doing directly." *See, e.g.*, *Nat'l Rifle Ass'n v. Vullo*, 602 U.S. 175, 190 (2024); *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963). Retaliatory government actions—whether direct or indirect, formal or informal—chill speech and cause self-censorship. *See, e.g.*, *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988); *Smith v. California*, 361 U.S. 147, 150–51 (1959) (inhibiting expressive freedom occurs "by making the individual more reluctant to exercise it").

Similarly, the U.S. Supreme Court has held that viewpoint discrimination is an egregious violation of the First Amendment. In *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995), after a public university denied funding to a Christian student newspaper, the U.S. Supreme Court declared:

13

> When the government targets not subject matter but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant. Viewpoint discrimination is thus an egregious form of content discrimination. The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction.

And—as Texas Courts have repeatedly recognized—the Texas Constitution grants broader speech protections than the United States Constitution does by virtue of its affirmative guarantee of the right, as opposed to a limiting principle. *See, e.g.,* *Davenport v. Garcia*, 834 S.W.2d 4, 8 (Tex. 1992).

*Amici* are troubled by the evidence that the underlying lawsuit is retaliatory in nature, designed not to protect Texans from deceptive trade practices, but to stifle otherwise protected speech that the Attorney General happens to disagree with.[7] In addition to their charitable giving, *Amici* are often driven by their faith to speak on issues of justice and compassion. *Amici* have all spoken publicly in opposition to policies that they believe to be in direct contradiction with the tenets of their faith, including the treatment of immigrants and family separation.

---

[7] *Amici's* concerns are far from unfounded. In a case involving a similar DTPA enforcement action brought by the Attorney General against Media Matters, the United States Court of Appeals for the District of Columbia found that Media Matters was likely to succeed on its claim that the DTPA enforcement action was retaliatory in nature. *See Media Matters for Am. v. Paxton*, 138 F.4th 563, 580-81 (D.C. Cir. 2025).

Although these topics are often viewed as "political," *Amici's* advocacy in this area is driven by the teachings of their faith:

> "When a stranger resides with you in your land, you shall not do him wrong. The stranger who resides with you shall be to you as the native among you, and you shall love him as yourself; for you were strangers in the land of Egypt[.]" *Leviticus* 19:33-34.

> "You shall not oppress a stranger, since you yourselves know the feelings of the stranger, for you were also strangers in the land of Egypt." *Exodus* 23:9.

> "For I was hungry, and you gave Me something to eat; I was thirsty, and you gave Me something to drink; I was a stranger, and you invited Me in." *Matthew* 25:35.

As explained below, an adoption of the interpretation of the DTPA advanced by the Attorney General will chill the speech and charitable activities of *Amici* and others like them for fear of retribution if they solicit funds in the name of advancing religious freedom and then distribute those funds to support causes the Attorney General disfavors.

## IV. Real Party's Continued Pursuit of Retaliatory DTPA Claims Against Relators Will Chill Protected Speech and Charitable Activities of *Amici*.

Expanding deceptive *trade* practices scrutiny to religious fundraising and charitable donations would apply consumer-litigation standards designed without consideration for the nuances of faith-based or charitable giving. The threat of selective enforcement actions, unclear liability, statutory penalties, and reputational harm would

15

force religious organizations with limited resources to narrow their charitable giving or end such programs altogether.

This risk is especially acute for charitable outreach that—in recent years, depending on the work of the charity—has come under increased scrutiny by the Attorney General. *See, e.g.*, *Paxton v. Annunciation House, Inc.*, No. 24-0573, 2025 WL 1536224, at *1-*2 (Tex. May 30, 2025); *In re Office of Attorney Gen.*, No. 15-24-00091-CV, 2025 WL 2204075, at *2 (Tex. App. [15th Dist.] Aug. 4, 2025) (detailing discovery requested from Catholic Charities of the Rio Grande Valley).

*Amici's* ability to engage in effective, meaningful charity depends on speed and flexibility—especially in crises. With the additional threat of prosecution under the DTPA, *Amici* and other religious organizations would be forced to slow-walk or decline emergency assistance, avoid innovative partnerships, and limit support to the safest, most bureaucratically defensible charitable giving. The result is fewer meals served, fewer shelters opened, fewer families helped, and fewer lives saved.

Layering the threat of DTPA enforcement on top of the regulation that religious and religiously affiliated organizations already face is unnecessary and unwarranted. Organizations like *Amici* already must comply with IRS rules and regulations, federal and state oversight of charities, fiduciary duty requirements, and accountability to their members and supporters. The marginal deterrence gained by expanding DTPA enforcement to encompass political and charitable giving is outweighed by the chilling effect and resource diversion that will come from the threat of such enforcement. The

16

additional compliance burden alone would siphon time and tithes from community service activities to paperwork: policies, disclosures, audits, legal reviews, and documentation of any and all representations made regarding the use of donated funds. *See, e.g.*, *Annunciation House, Inc.*, 2025 WL 1536224, at \*1-\*2 (describing Attorney General's investigation of religious charitable organization that provides shelter and resources to the needy regardless of their immigration status). Faced with that tradeoff, many faith-based and religious organizations will retreat from charitable activity altogether—precisely the opposite of what vulnerable Texans need.

Critically, smaller organizations would be the least equipped to shoulder this financial burden, considering the expansive power that the Attorney General has to freeze assets in response to suspected violations of the DTPA and the substantial fines that can be imposed, should a violation ultimately be found.

## V. Direct Harm Will Befall *Amici* and the Communities They Serve If Mandamus Is Not Granted.

If religious organizations like *Amici* are forced to curtail or sanitize their fundraising speech out of fear of enforcement under the DTPA, the consequences will reverberate far and wide. Faith communities rely on heartfelt appeals to support food pantries, disaster relief, homeless shelters, and outreach ministries that serve the most vulnerable. In cities and rural areas alike, faith-based clinics and counseling centers are often the only lifeline for underprivileged Texans. The potential chilling of religious

17

fundraising speech is not an abstract legal harm; it would result in a direct blow to the safety net that countless Texans depend on.

Beyond the potential loss of services, the erosion of trust between religious organizations and the communities they serve will be profound. When faith-based charities must second-guess every word in their appeals, their messages become sterile, bureaucratic, and disconnected from the spiritual mission that inspires generosity. Donors, sensing hesitation and fear, may withdraw their support. Communities that once saw *Amici* as a beacon of hope and compassion will instead see uncertainty and retreat. The bonds of trust—built over generations through shared sacrifice and service—will fray, leaving both the organizations and the people they serve isolated and diminished. In the end, the chilling of religious speech undermines not only the work of faith-based groups like *Amici*, but the very fabric of community life in our state.

And the harm will not stop with *Amici*. If the Attorney General's unprecedented use of the DTPA against political fundraising continues, it will empower current and future Attorneys General to target a wide array of non-profit, advocacy, religious, and charitable organizations—especially those disfavored by the government of the day—under the guise of "consumer protection." The shadow of DTPA enforcement will undoubtedly curtail the solicitation of charitable donations and the spending of donated funds across Texas.

18

## CONCLUSION AND PRAYER

*Amici* live their faith by helping the most vulnerable among us and are compelled to speak for those who cannot speak for themselves. The threat of selective prosecution should the Attorney General be permitted to advance the underlying action—and others like it—will frustrate *Amici's* efforts to practice their faith by exposing them to possible prosecution for raising funds for charitable causes disfavored by the Attorney General. Not only will that harm befall *Amici* but those most in need of assistance, those who turn to faith-based organizations for safety and shelter, will no longer find refuge. Those that *Amici* seek to help will be—literally and figuratively—left in the cold once more.

*Amici* join Relators in their request for a mandamus to issue to order Respondent to dismiss this case for lack of subject matter jurisdiction under the DTPA.

DATED: September 19, 2025                    Respectfully submitted,


Peter Steffensen                        */s/ Kathryn "Kassi" Yukevich*
State Bar No. 24106464                   Kathryn "Kassi" Yukevich
Molly Ryan*                              State Bar No. 24133390
State Bar No. 24148032                   TILLOTSON JOHNSON & PATTON
Amanda Sparks[*]                         1201 Main St., Suite 1300
State Bar No. 24148033                   Dallas, Texas 75202
SMU DEDMAN SCHOOL OF LAW                 Telephone:   (214) 382-3046
FIRST AMENDMENT CLINIC                   Facsimile:    (214) 501-0731
P.O. Box 750116                          kyukevich@tillotsonlaw.com
Dallas, TX 75275-0116
Telephone: (214) 768-4077                Thomas S. Leatherbury
psteffensen@smu.edu                      State Bar No. 12095275
                                         THOMAS S. LEATHERBURY LAW, PLLC
                                         Cumberland Hill School Building
                                         1901 North Akard Street
                                         Dallas, TX 75201-2305
                                         (214) 213-5004
                                         tom@tsleatherburylaw.com

                                         Counsel for *Amici Curiae*

## CERTIFICATE OF SERVICE

The undersigned certifies that a true and correct copy of the foregoing Brief of

*Amici Curiae* has been electronically filed and served on all counsel of record. *See* Tex.

R. App. P. 9.2(c)(1), 9.5(b)(1).

                              */s/ Kathryn "Kassi" Yukevich*
                              Kathryn "Kassi" Yukevich

---

[*]Associate Member of the State Bar, authorized under Rule VI.A(4) of the Rules Governing the Supervised Practice of Law by Qualified Law Students.

## <u>CERTIFICATE OF COMPLIANCE</u>

1. This brief complies with the type-volume limitation of Tex. R. App. P. 9.4(i)(2)(B) because it contains 4,485 words, excluding the parts of the brief exempted by Tex. R. App. P. 9.4(i)(1).

2. This brief complies with the typeface requirements of Tex. R. App. P. 9.4(e) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Garamond font.

*/s/ Kathryn "Kassi" Yukevich*
Kathryn "Kassi" Yukevich

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Kathryn Yukevich
Bar No. 24133390
kyukevich@tillotsonlaw.com
Envelope ID: 105856097
Filing Code Description: Brief Not Requesting Oral Argument
Filing Description: Brief for Amici Curiae in Support of Relators
Status as of 9/22/2025 7:23 AM CST

Associated Case Party: State of Texas

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| William Cole | 24124187 | William.Cole@oag.texas.gov | 9/19/2025 5:52:15 PM | SENT |
| Rob Farquharson | | rob.farquharson@oag.texas.gov | 9/19/2025 5:52:15 PM | SENT |
| Abby Smith | | abby.smith@oag.texas.gov | 9/19/2025 5:52:15 PM | SENT |
| Johnathan Stone | | johnathan.stone@oag.texas.gov | 9/19/2025 5:52:15 PM | SENT |
| William Peterson | | William.Peterson@oag.texas.gov | 9/19/2025 5:52:15 PM | SENT |
| Justin Sassaman | | justin.sassaman@oag.texas.gov | 9/19/2025 5:52:15 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Sean McCaffity | 24013122 | smccaffity@textrial.com | 9/19/2025 5:52:15 PM | SENT |
| Robert Farquharson | 24100550 | rob.farquharson@oag.texas.gov | 9/19/2025 5:52:15 PM | SENT |
| Maria Williamson | | maria.williamson@oag.texas.gov | 9/19/2025 5:52:15 PM | SENT |
| William FCole | | William.Cole@oag.texas.gov | 9/19/2025 5:52:15 PM | SENT |
| Mimi Marziani | | mmarziani@msgpllc.com | 9/19/2025 5:52:15 PM | SENT |
| Joaquin Gonzalez | | jgonzalez@msgpllc.com | 9/19/2025 5:52:15 PM | SENT |
| Brian Falligant` | | bfalligant@inquestresources.com | 9/19/2025 5:52:15 PM | SENT |
| Pauline Sisson | | pauline.sisson@oag.texas.gov | 9/19/2025 5:52:15 PM | SENT |
| Rebecca Stevens | | bstevens@msgpllc.com | 9/19/2025 5:52:15 PM | SENT |
| Emily Samuels | | emily.samuels@oag.texas.gov | 9/19/2025 5:52:15 PM | SENT |
| William Peterson | | william.peterson@oag.texas.gov | 9/19/2025 5:52:15 PM | SENT |
| Rebecca Neumann | | rneumann@textrial.com | 9/19/2025 5:52:15 PM | SENT |
| Nancy Bentley | | ndbentley@tarrantcountytx.gov | 9/19/2025 5:52:15 PM | SENT |

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Kathryn Yukevich
Bar No. 24133390
kyukevich@tillotsonlaw.com
Envelope ID: 105856097
Filing Code Description: Brief Not Requesting Oral Argument
Filing Description: Brief for Amici Curiae in Support of Relators
Status as of 9/22/2025 7:23 AM CST

Case Contacts

| Nancy Bentley | | ndbentley@tarrantcountytx.gov | 9/19/2025 5:52:15 PM | SENT |
|---|---|---|---|---|
| Lisa Adams | | LAAdams@tarrantcountytx.gov | 9/19/2025 5:52:15 PM | SENT |